**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ROKIOT USA, LLC,<br><br>            *Plaintiff*,<br><br>v.<br><br>SPENCER HEALTH SOLUTIONS,<br>INC.,<br><br>            *Defendant*. | Case No. 1:23-cv-_____<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Rokiot USA, LLC ("Rokiot" or "Plaintiff") files this complaint against Defendant Spencer Health Solutions, Inc. ("Spencer" or "Defendant") for infringement of U.S. Patent No. 7,155,202 (the "'202 patent" or "Asserted Patent") and in support thereof alleges as follows:

## INTRODUCTION

1.      This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code.

## THE PARTIES

2.      Rokiot is a Delaware limited liability company that maintains its principal place of business in Winters, Texas.

3.      Defendant is a Delaware corporation.

## JURISDICTION

4.      This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331 and 1338(a) because Rokiot's patent infringement claims arise under the patent laws of the United States, Title 35 of the United States Code.

5.      This Court has personal jurisdiction over Defendant because it is a Delaware

corporation.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1400 because Defendant is incorporated in Delaware and thus resides in this judicial district.

## BACKGROUND

### Rokiot

7.     Rokiot is an American innovation company founded by Abdelsalam ("Sumi") Helal, Ph.D, a widely recognized pioneer in the field of the Internet-of-Things ("IoT"). Dr. Helal is a Professor in the Computer & Information Science and Engineering department at the University of Florida, where he also serves as Director of the Mobile and Pervasive Computing Laboratory. Dr. Helal is a Fellow of the ACM, IEEE, AAAS, AAIA, IET, and a member of Academia Europaea.

8.     One of Dr. Helal's specific areas of research is in smart and connected health, including smart homes, health telematics and connected health. At the University of Florida, Dr. Helal co-founded and directed the Gator Tech Smart House, a real-life smart space deployment for developing and validating sensor-and device-based assistive technologies in support of aging, disability, and independence. The Gator Tech Smart House garnered widespread attention as a showcase of assistive technologies enabled by Dr. Helal's inventions.

9.     The Patent Office has recognized Dr. Helal's inventive achievements by awarding him several patents, including the one infringed by Defendant in this case. Leading technology companies have also recognized the merit of Dr. Helal's inventions and taken licenses under his patents.

10.     While he is a technologist at heart, Dr. Helal has founded ventures to commercialize his IoT and digital health inventions. One of Dr. Helal's commercialization startups is Rokiot.

**The '202 Patent**

11.    Rokiot is the owner, by assignment, of all rights, title, and interest in and to U.S. Patent No. 7,155,202 (the "'202 patent" or "Asserted Patent"), titled "Portable Device Medical Assistant." When it was issued, the '202 patent was assigned by Dr. Helal to the University of Florida.  The '202 patent was reassigned back to Dr. Helal in 2010, and he then assigned it to his company, Rokiot USA LLC, in 2016.

12.    A true and correct copy of the '202 patent is attached hereto as Exhibit 1 and incorporated by reference into this Complaint.

13.    As the sole owner of the '202 patent, Rokiot holds all substantial rights in and under the patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past, present, and future infringement.

14.    The United States Patent Office issued the '202 Patent on December 26, 2006, after a full examination and determination that it complied with all statutory requirements for patentability.

15.    The '202 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

16.    The '202 patent application was filed on July 12, 2004, and assigned application number 10/889,161. The '202 patent claims the benefit of both U.S. Provisional Application Ser. No. 60/486,018, filed in the United States Patent and Trademark Office on Jul. 10, 2003, and 60/490,717, filed in the United States Patent and Trademark Office on Jul. 29, 2003. Both provisional applications were incorporated by reference into the '202 patent application.

17.    The '202 patent relates to the field of portable computing devices and, more particularly, to a portable communication device and method for providing medical assistance.

'202 patent, 1:15-19. Generally, the '202 patent is directed to a device and method for managing a material substance program, such as a medicine to be taken on a certain schedule.

18.    The '202 patent addressed problems including those related to providing detailed medical assistance that is cost effective, yet still comprehensive.

19.    Although hospitals have provided systems to monitor a patient's biometric statistics, the monitoring typically requires a patient to be bedridden for effective monitoring. Additionally, the monitoring of the different substances and materials prescribed to a patient is typically monitored by a nurse and/or doctor. Nevertheless, misallocation and improper prescription of materials to patients results in multiple accidents on a yearly basis. These accidents can be life threatening or worse and can expose insurance companies to great liability. '202 patent, 1:46-55.

20.    Therefore, there existed prior to Dr. Helal's invention a need for a material management program that can prevent the misallocation and/or improper prescription of materials. Further, the need not only existed in the hospital, but also existed outside of the hospital environment. '202 patent, 1:56-60.

21.    In one embodiment of Dr. Helal's invention, a device for managing a material substance program can include a portable computing device having mobile telephony capabilities and a wireless identification device communicably coupled to the portable computing device for identifying materials. The wireless identification device can be one or more of a bar code reader, a radio frequency identification mechanism, and a combination thereof. The portable computing device can also include one or more of a display screen, an audible transducer, a vibration mechanism, and a combination thereof. Additionally, the portable computing device can include memory for storing material information. '202 patent, 2:9-20.

22.    In another embodiment of Dr. Helal's invention, a method for managing a material substance program can include the steps of scanning a material source to identify a material identifier, sending the material identifier to a proxy server, and receiving material information from the proxy server. Also, the method can include the step of displaying material information on a portable computing device having mobile telephony capabilities. '202 patent, 2:21-28.

23.    In another arrangement, the method can include the step of programming a material notification in accordance with the material information. Also, the material notifications can be provided with a portable computing device having mobile telephony capabilities. Further, providing material notifications can include one or more of displaying material information, audibly conveying the material information, initiating vibration of the portable computing device, and a combination thereof. '202 patent, 2:29-37.

24.    Still further, the method can include the step of receiving user confirmation that a material was consumed. Additionally, the material quantity can be tracked in accordance with consumption and material can be ordered in accordance with the material quantity. '202 patent, 2:38-43.

25.    In yet another embodiment, a machine-readable storage can be provided. The machine-readable code can have stored thereon, a computer program having a plurality of code sections, where the code sections are executable by a machine for causing the machine to perform the steps of the method. '202 patent, 2:44-49.

26.    FIG. 1 of the '202 patent, reproduced below, is a schematic diagram illustrating an exemplary portable computing device (PCD) 100 for managing a material substance program.



**FIG. 1**

27.    Claim 1 of the '202 patent recites, "A device for managing a material substance program, comprising: a portable computing device having a user interface and mobile telephony capabilities for transmitting a material identifier to a proxy server via a communications network, and for receiving material information regarding a material substance from a material supply server via the communications network, the material information corresponding to the material identifier; a calendar operated by said computing device for scheduling times that a user consumes the material substance, the scheduling based upon the received material information; a first notifier operated by said computing device for providing notifications to the user via said user interface based upon said calendar and reminding the user when the user is scheduled to consume the material substance; a recorder operated by the computing device for recording responses provided by the user via the user interface confirming when the user consumes the material substance at a scheduled time; a second notifier operated by said computing device for notifying a third-party when the user fails to provide a response within a predetermined interval after a notification is provided by said first notifier; and a wireless identification device communicably coupled to the

portable computing device for identifying the material identifier prior to transmission of the material identifier to the proxy server." '202 patent, 11:46 – 12:8.

28.     Claim 5 of the '202 patent recites, "A method for managing a material substance program, comprising the steps of: scanning a material source to identify a material identifier; sending the material identifier to a proxy server: receiving material information from the proxy server; based on the received material information, scheduling times that a user takes a material substance; based upon said calendar, providing intermittent notifications to the user via a user interface of a portable computing device having mobile telephony capabilities so as to remind the user when the user is scheduled to consume the material substance; recording responses provided by the user via the user interface confirming when the user consumes the material substance at a scheduled time; and notifying a third-party when the user fails to provide a response within a predetermined interval after the user receives an intermittent notification." '202 patent, 12:20-38.

29.     The claimed subject matter of the '202 patent is directed to patentable subject matter, and the claims recite technical solutions to technical problems encountered when managing material substance programs.

30.     The technological improvements claimed in the claims of the '202 patent include, for example, a device for managing a material substance program, comprising: a portable computing device having a user interface and mobile telephony capabilities for transmitting a material identifier to a proxy server via a communications network, and for receiving material information regarding a material substance from a material supply server via the communications network, the material information corresponding to the material identifier; a calendar operated by said computing device for scheduling times that a user consumes the material substance, the scheduling based upon the received material information; a first notifier operated by said

computing device for providing notifications to the user via said user interface based upon said calendar and reminding the user when the user is scheduled to consume the material substance; a recorder operated by the computing device for recording responses provided by the user via the user interface confirming when the user consumes the material substance at a scheduled time; a second notifier operated by said computing device for notifying a third-party when the user fails to provide a response within a predetermined interval after a notification is provided by said first notifier; and a wireless identification device communicably coupled to the portable computing device for identifying the material identifier prior to transmission of the material identifier to the proxy server.

31.    The technological improvements claimed in the claims of the '202 patent also include, for example, a method for managing a material substance program, comprising the steps of: scanning a material source to identify a material identifier; sending the material identifier to a proxy server: receiving material information from the proxy server; based on the received material information, scheduling times that a user takes a material substance; based upon said calendar, providing intermittent notifications to the user via a user interface of a portable computing device having mobile telephony capabilities so as to remind the user when the user is scheduled to consume the material substance; recording responses provided by the user via the user interface confirming when the user consumes the material substance at a scheduled time; and notifying a third-party when the user fails to provide a response within a predetermined interval after the user receives an intermittent notification.

32.    The asserted claims are not directed to an abstract idea, law of nature, or natural phenomenon, and contain one or more technical, inventive concepts for improving the management a material substance program by, *inter alia*, providing a non-conventional and non-

generic arrangement of mechanical, communication, imaging, and processing components to consolidate the technology for the administration and monitoring of, and compliance with a material substance program such as a pharmaceutical medication prescription schedule.

33.     The combination of elements recited in the claims of the '202 patent did not exist in the prior art and were not well-understood, routine, nor conventional when the application that became the '202 patent was filed, as evidenced by the fact that the patent examiner allowed the claims of the '202 patent to issue.

34.     In addition, the significance of the inventiveness of the '202 patent is illustrated by the fact that it has been cited in at least 23 other U.S. patents and published patent applications, providing further proof that the inventions claimed and disclosed in the '202 patent were not well-understood, routine, or conventional at the time of the invention.

**Defendant's Infringing Products**

35.     Defendant makes, uses, sells, offers to sell, or imports products that embody claims of Rokiot's '202 patent ("Accused Products"). For example, Defendant makes, uses, sells, offers to sell and/or imports into the United States the "spencer® Smart Hub" device.

36.     Defendant publishes information about the Accused Product on its website:



# Meet spencer®

### I'm the hub of a seriously connected health network.
### It's the result of thinking outside the (pill) box.

As the world's first and only in-home patient support platform, the spencer SmartHub is the future of patient engagement.

spencer connects patients and their care teams through an easy-to-use, fully integrated platform. The result? Better patient support, increased patient engagement, and higher medication adherence.

In other words, the things that matter for clinical trials, commercial pharmaceutical programs, and care management facilities.

*See* https://spencerhealthsolutions.com/home/meet-spencer/.

37.    The Accused Products feature a user interface, mobile telephony capabilities, and a barcode scanner capable of transmitting material identifiers and receiving information about a user's medicines based upon material identifiers.

38.    The Accused Products maintain a calendar with scheduled dose times and send reminders to the user and chosen third parties when it is time to take medication.

39.    Representative pictures of the spencer® Accused Products from Defendant's spencer® User Guide ("User Guide") are reproduced below and identify the device's lid, refill tub, touch screen, dispenser, and medication refill.  The representative pictures also identify the Accused Device's carrying case, power button, power cord, and usb charging port. *See* https://spencerhealthsolutions.com/wp-content/uploads/2020/12/12215.02-spencer-Device-User-Guide-English-v43_updated-graphic-UNIVERSAL.pdf.





**Overview**

spencer® makes taking multiple medications easier.

An in-home medication dispenser, your spencer device is a new way to connect you with your pharmacist and care teams to help you stay on track with your medications and health goals.

The pictures below help you locate some of the key features.





40.     Defendant specifically markets its Accused Products as providing medication adherence. For example, on its website, Defendant says the following regarding its spencer device:



# Medication Dispensing for Better Adherence

spencer dispenses the right pills in the right dosage at the right time.

Medications come prepackaged from partner pharmacies or clinical packagers. To help patients avoid confusion, it shows pictures of the pills to be taken. If the patient plans to be away, medications can be dispensed in advance. And through the spencerAssist® mobile app, family members can join the patient's circle of care.

Our fully connected patient support platform addresses one of the big concerns for pharmaceutical companies and care management organizations – medication adherence. With spencer in the home, patients have a friendly device to help them remain adherent.

11

*See* https://spencerhealthsolutions.com/home/meet-spencer/.

41.     The spencer® device is an AC powered, countertop, in-home device intended to assist users by providing alerts for pre-determined medication dosing schedules and tracking adherence. The spencer® device uses wireless communication along with spencerCare™, spencerAssist® and spencerConnect software to inform users, caregivers, and healthcare professionals.

42.     spencerConnect is proprietary software installed on the spencer® device that enables a user to connect their spencer® device to other medical devices (e.g. glucometer, blood pressure cuff) for recording, transferring, and storing readings.

43.     spencerAssist® is proprietary software installed on a mobile device (e.g. phone, tablet) and spencerCare™ is proprietary web-based software viewed at a pharmacy. This software is intended to inform users, caregivers, and healthcare professionals with medication alerts, medication adherence information, and readings from connected devices.

44.     The spencer® is a portable computing device with a user interface consisting of a touch screen, camera, microphone, and speaker, with wireless capabilities capable of transmitting a material identifier, e.g., a QR or barcode, to a proxy server via a communications network.

45.     The spencer® includes the following Peripherals: Display: 7" Diagonal, 800 x 480 resolution, PCAP touch screen; Camera: 5M Pixel; Microphone: Omnidirectional; Speaker: 3W Stereo; Bluetooth: 4.0 (classic and BLE); and USB: 1A Max (Charging only).

46.     The spencer® includes at least the following Network Connections: Cell connection – CAT 1; LTE; and Wi-Fi.  The spencer® operates with and on the Verizon network.

47.     In order to use its communication and information features, the spencer® device must be connected to the internet. There are two options for this connection. First, Cellular - which

is built into spencer and always working if cellular reception is available. Second, Wi-Fi - which is preferred if a Wi-Fi network is available.

48.     The spencer® device scans a barcode on a refill package and transmits material identifiers to a proxy server on the cloud. The spencer® device then receives medication information corresponding to the material identifiers from the material supply server.

49.     The spencer® device has various components and features, including:

a.  Secure Data Storage: Records spencer® device transactions and communications with pharmacy

b.  spencerAssist: Mobile application for iOS or Android that tracks adherence and readings such as weight, blood pressure, glucose, blood oxygen, and heart rate.

c.  spencerCare: Web application that supports the spencer® device and allows a professional care team to track medication adherence and health information and to communicate with the user.

50.     The spencer® device provides Security in that user input is made through captive screen only and all inbound ports are closed, allowing outbound traffic to spencerCloud only. Communication with spencerCloud uses Transport Level Security (TLS) with AES 256 encryption.

51.     If the spencer® device falsely triggers an "invalid scan" error message, a user can remove the refill, then reinsert the refill and close the lid. If the information on the refill and pack barcode are scanned successfully, the device accepts the refill.

52.     Coding on the label of a refill specifies the local time zone. If a user moves a spencer® device to a different time zone, the Home screen displays the time from the original time zone until the next refill. The display time is controlled by the coding on a refill pack. If a user

moves to a different time zone, the display time and dispensing will adjust to the new time zone when the user gets a new refill that is prepared for their new address. When the spencer® device is connected to a network, the drug images are available for viewing on the device.

53.     The spencer® device operates a calendar with scheduled pill dispensing based upon the medical information automatically uploaded after scanning the QR code or barcode on the refill package.

54.     To see any information about a medication, a user can touch the pill icon on the spencer® device's home screen. The Medications screen is then displayed with three options. The first option is My Schedule — To see upcoming dispense times and medications. The second option is My Medications — To see pictures of your meds with their names and dosage. The third option is Meds on the Go — To dispense meds ahead of time for a period that you define.

55.     The My Schedule option shows pictures, dosage, and timing for all medications in each dose in the current spencer refill. On the spencer® device Home screen, after a user touches Medications and then touches My Schedule, their medication schedule including pictures of each medication is displayed.

56.     The spencer® device is an AC powered, countertop, in-home device intended to assist users by providing alerts for pre-determined medication dosing schedules and tracking adherence. spencer device uses wireless communication along with spencerCare™, spencerAssist® and spencerConnect software to inform users, caregivers, and healthcare professionals.

57.     The spencer® device reminds users via audio reminders and messages appearing on the touch screen when a scheduled dose is ready, as well as reminders if a dose has not been taken at the scheduled time.

58.    The spencer® device's dispense reminders include (i) Alert tone with adjustable volume; sound intensifies for escalated dispense; (ii) Flashing light that increases in frequency for escalated dispense; (iii) Change in screen color from black (normal) to amber (escalated); and, (iv) Change in screen color to red (missed dose).

59.    The spencer® device has the following Dispense screens. Normal dispense: The home screen changes when it is time to dispense medications to remind a user to take meds during the normal dispense time. Escalated dispense screen: Warns that the dispense time has almost passed. Missed meds screen: A red screen tells a user that they have missed their medications.

60.    For Normal dispense, when the dispense time arrives, spencer® wakes up and winks to tell a user it is time for their medication. A dispense button, as shown in the image below, flashes and an alert is played. The user must then touch the Dispense button before the medication is dispensed. The spencer® device records the time the medicine is dispensed as a result of the user touching the Dispense button.



61.    The spencer® device presumes medications are taken at the time they are dispensed. On page 15 of the User Guide, for example, the relevant portion of which is reproduced below, one of the spencer® device's most prominent "Components and features" is "Dose" that provides "All medications taken at a given dispense time." Thus, the user's pressing of the

Dispense button confirms the user consumes the medicine.



62.     The spencer® device records many measurements of its user that it displays though

a Readings menu as shown below.



63.     One such reading is "Adherence", through which the spencer® device, "keeps track

of when you take your medication. Adherence shows the percentage of doses that you take on

time."



**O Adherence**
Spencer keeps track of when you take your medication.
Adherence shows the percentage of doses that you take on
time.

64.    Spencer identifies this functionality as the Intended Use of the spencer® device, as shown below from page 5 the User Guide.

**O Intended use (US)**
1    The spencer® device is an AC powered, countertop, in-home device intended to assist users by providing alerts for pre-determined medication dosing schedules and tracking adherence. spencer device uses wireless communication along with spencerCare™, spencerAssist® and spencerConnect software to inform users, caregivers, and healthcare professionals.

65.    After the medicine pack is dispensed by the spencer® device, the user then responds to a prompt on the screen by removing the medicine pack from the dispenser user interface. The removal of the medicine pack is a response provided by the user via the user interface that is recorded by the spencer® device confirming that the user consumes the medicine at the scheduled time.

66.    After the medication pack is dispensed, follow up messages or questions may be displayed including those that require a response. Responses to these messages provided by the user are recorded by the spencer® device and confirm that the user consumes the medication at the scheduled time.

67.    Examples of follow up messages or questions displayed by the spencer® device are provided below:



68.    Reminders, questions, or other messages may be displayed by the spncer® device at the end of a dispense time. If the message requires a response, a user may touch the appropriate button on the screen. For example, a user may touch OK. Users may answer any question by touching the appropriate answer. A question can have between three and six possible answers, such as shown in this example.

69.    The touching of the Dispense button, the removal of the medicine from the dispenser, and the response to post-dispensing messages or questions are, independently and collectively, responses provided by the user of the spencer® device via the user interface that are recorded by the spencer® device that confirm when the user consumes the medicine at a scheduled time.

70.    The spencer® device notifies third party caregivers including healthcare providers and pharmacists when a user fails to provide a response after receiving the initial notification that a scheduled medicine dosage was ready.

71.     For the spencer® device, feedback helps create the optimal medication plan. When it is time to take medications, the in-home medication dispenser prompts patients to dispense their medications at pre-scheduled times with audible and visual alerts. By alerting providers and pharmacists about missed or late doses, the dispenser delivers actionable insights that can help provide prompt intervention and support for non-adherent patients.

72.     spencerAssist® is a mobile application that connects care managers, pharmacists, and caregivers with patients for ease in tracking and sharing data and information related to medications and health status. spencerAssist is the companion mobile app to the spencer® medication adherence and engagement platform designed to advance healthcare from the home. Download today for healthier outcomes. spencerAssist provides insights to medication schedules. Reminders and missed dose alerts can be customized.

73.     One function performed by spencerAssist is providing Alert Details, an example of which is provided below.



74.     The spencer® device contains a barcode scanner that identifies the material

identifier prior to its transmission to the proxy server.

75.    If the spencer® device falsely triggers an "invalid scan" error message, a user can remove the refill, then reinsert the refill and close the lid. If the information on the refill and pack barcode are scanned successfully, the device accepts the refill.

76.    Coding on the label of a refill specifies the local time zone. If a user moves their spencer® device to a different time zone, the Home screen displays the time from the original time zone until the next refill.

## COUNT I: INFRINGEMENT OF THE '202 PATENT

77.    Rokiot hereby restates, realleges, and incorporates by reference the foregoing paragraphs of the Complaint as if fully stated herein. Rokiot further alleges as follows:

78.    Rokiot is the owner by assignment of all rights, title, and interest in the '202 Patent. The '202 Patent is presumed valid and enforceable.

79.    Defendant makes, uses, offers for sale, sells, or imports Accused Products, including at least the spencer® SmartHub device, in the United States and in this district that directly infringe one or more claims of the '202 Patent, literally or under the doctrine of equivalents, including at least claims 1 and 5 of the '202 Patent as set forth in the infringement claim chart attached as Exhibit 2.

80.    Defendant has known about the '202 Patent and how the accused instrumentalities infringe since at least October 31, 2022, when Rokiot provided actual notice of infringement.

81.    Defendant knowingly and intentionally induces infringement of the '202 patent in violation of 35 U.S.C. § 271(b). Prior to, or at least through, the filing and service of this complaint, Defendant knew of the '202 patent and the infringing nature of the Accused Products. With knowledge of the '02 patent and how the Accused Products infringe, Defendant continues to

actively encourage users of the Accused Products to directly infringe the '202 Patent. Defendant does so with knowledge and intent that the users of its products commit these acts of infringement.

82.     Defendant also continues to make, use, offer for sale, sell, and/or import the Accused Products despite knowing of the '202 patent, thereby specifically intending for and inducing users of its products to infringe the '202 patent through their normal and intended use of the Accused Products.

83.     On information and belief, Defendant contributes to their users' infringement of the '202 patent by making, using, offering to sell, selling, and/or importing the Accused Products that have no substantial non-infringing uses.

84.     Defendant's infringing activities are and have been without authority or license under the '202 patent.

85.     To the extent Defendant has infringed or continues to infringe after knowledge of the '202 Patent, such infringement is deliberate, knowing, and willful under 35 U.S.C § 271.

86.     Rokiot, under 35 U.S.C. § 284, is entitled to recover damages adequate to compensate for Defendant's infringement, and in no event less than a reasonable royalty for the use made of the invention by Defendant together with interest and costs as fixed by the Court.

87.     The Court should declare this an exceptional case under 35 U.S.C. § 285, entitling Rokiot to recover treble damages and attorneys' fees.

### NOTICE

88.     Rokiot has complied with the notice requirements of 35 U.S.C. § 287 and provided actual notice of infringement prior to filing this Complaint.

### DEMAND FOR JURY TRIAL

89.     Plaintiff demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

Rokiot respectfully requests that the Court enter:

a.  A judgment in favor of Rokiot that Defendant has infringed the '202 patent literally and/or under the doctrine of equivalents;

b.  A judgment and order requiring Defendant to provide an accounting and to pay Rokiot its damages, costs, expenses, and pre-judgment and post-judgment interest for Defendant's infringement of the '202 patent;

c.  A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Plaintiff its reasonable attorneys' fees against Defendant;

d.  Any and all injunctive or equitable relief to which Rokiot is entitled, including but not limited to a permanent injunction prohibiting Defendant's continued infringement of the '202 patent, or at minimum ongoing royalties with respect thereto; and,

e.  Any and all other relief as the Court may deem appropriate and just under the circumstances.

Dated: December 15, 2023

Respectfully Submitted,

By: /s/ *Stamatios Stamoulis*
Stamatios Stamoulis (#4606)
STAMOULIS & WEINBLATT LLC
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com

Daniel Ravicher (FL Bar No. 102809)
ZEISLER PLLC
777 Brickell Ave Ste 500
Miami, FL 33131
Phone: (786) 505-1205
dan@zeisler-law.com

*Attorneys for Plaintiff Rokiot USA, LLC*